IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 15, 2017

## STATE OF TENNESSEE v. SANDRA DARLENE WOOD

**Appeal from the Circuit Court for Marshall County**
No. 15-CR-112        Forest A. Durard, Jr., Judge

_____

### No. M2016-01225-CCA-R3-CD

_____


Defendant, Sandra Darlene Wood, was convicted following a jury trial in Marshall County Circuit Court of one count of cruelty to animals. Following a sentencing hearing, the trial court sentenced Defendant to 11 months, 29 days suspended on probation after 45 days' incarceration and ordered Defendant to pay $4,134 in restitution to Volunteer Equine Advocates. Defendant raises three issues on appeal: (1) whether the evidence is sufficient to sustain her conviction for cruelty to animals; (2) whether the sentence imposed is excessive and contrary to the law; and (3) whether the trial court properly admitted testimony regarding a prior visit by a Sheriff's Department Detective to her farm in June, 2014. After a careful review of the record and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Donna Orr Hargrove, District Public Defender; William J. Harold and Michael J. Collins, Assistant District Public Defenders, for the appellant, Sandra Darlene Wood.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Robert James Carter, District Attorney General; Felicia Walkup and Weakley E. Barnard, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Facts*

On June 27, 2014, Detective Drew Binkley, of the Marshall County Sheriff's Department, responded to a call regarding the condition of several horses at Defendant's farm. Defendant told Detective Binkley that she had been out of state and that her husband and son had failed to properly care for the horses. Detective Binkley was concerned about the condition of the horses. He testified, "you could see hip bones, rib bones, [and] the spine of the back." He observed that the horses had very little grass to eat, and the grass available to the horses was short and mostly weeds. Detective Binkley took several photos of the horses and relayed his concerns to Defendant.

Detective Binkley and Defendant discussed her plan to get weight back on the horses and what would happen if the horses' condition did not improve. Detective Binkley advised Defendant and her husband that they needed to provide more hay for the horses. Detective Binkley told Defendant that her horses were being underfed. Detective Binkley saw some hay at the farm when he drove back by a few days later, but he did not visit Defendant again until April 2015, when he responded to another complaint about the horses. He testified that he saw multiple malnourished horses, including the same underweight horses that he had observed on his prior visit. Detective Binkley was accompanied by Detective Tony Nichols when he responded to the second call to Defendant's farm. Detective Binkley did not see any hay or food in the horses' pasture, and he testified that the pasture "appeared to be more mud than anything."

Detective Tony Nichols also testified that several of the horses were underweight and had protruding bones and minimal fat or muscle. Detective Nichols observed that the horses' pasture was rocky, covered in weeds, and had no grass that was appropriate for the horses. He testified that he saw no signs of hay or other feed on the farm. Detective Nichols informed Defendant that he intended to contact the county extension agent, Ricky Skillington, to begin a removal procedure to take the horses out of Defendant's care. Defendant told Detective Nichols that she owned the horses and she called them "her babies."

On the following day, Detective Nichols returned to Defendant's farm with Detective Binkley and Agent Skillington. In assessing the horses' condition, they determined that the horses needed to be removed from the property. Agent Skillington examined the horses and found "very little evidence of feed," and the horses were quickly consuming whatever grass was growing. Agent Skillington also examined the horses' manure to check for signs of concentrated feed that sometimes survives the horses'

digestive tract, but he found no signs of feed whatsoever. He found no hay in the feed pans and no signs of any recently used feed bags.

Agent Skillington used a metric called the Henneke body condition score (BCS) to assess and examine the horses. According to Agent Skillington, as a general rule, the agricultural industry uses the Henneke BCS, developed at Texas A&M University, which consists of a 1 to 9 scale used specifically for horses. The optimum score is 5, while 1 indicates the horse is critically underweight and 9 indicates it is severely overweight. Mr. Skillington testified that a score of 4 to 6 is the industry standard and an indication that the horse is healthy. The BCS was developed to get as close as possible to a uniform system. Skillington declined to score any of the horses any higher than a 3, with two horses rating only a 1.5. According to Skillington, at a body condition score of 1.5, "you could count every individual vertebrae that they had along their backbone." Skillington testified that the horses' level of malnutrition was the cause for him to make his determination. He testified that for a horse to lose weight in that manner, it would have to have taken place over an extended period of time.

Dr. Emily McDonald, a veterinarian with the Gallatin Animal Hospital, testified as an expert witness in the field of veterinary science. Dr. McDonald also examines and treats animals for the Volunteer Equine Advocates (VEA), a non-profit organization which takes in rescued horses. Dr. McDonald also used the Henneke BCS to evaluate Defendant's horses. Dr. McDonald examined Defendant's horses, and she agreed that a healthy horse should have a body condition score between a 4 and 6. She found that all of Defendant's horses had a body condition score between 1 and 2, and that underfeeding was the best explanation for such a condition. She also testified that this kind of malnutrition required a progression of six to eight months and could not have taken place just recently. She believed there were signs of long term starvation.

Each of the eight horses on Defendant's farm was designated by name. Mary, a pregnant mare, was given a BCS of 1, based on a lack of food, and she had visible bones in her ribs, spine, neck, and hips. Mary was the horse elected by the State as the subject animal in the single count of animal cruelty. Dr. McDonald testified that it would take a horse five to six months to get in the shape that Mary was in. VEA removed the horses on April 6, 2015. Mary gave birth to an undersized foal soon after her removal. The foal was determined to have low weight due to mare malnutrition.

Agent Skillington and Dr. McDonald both testified about the effect a harsh winter can have on a horse's weight. They testified that a horse is unlikely to drop more than one body condition score over the course of a hard winter. Even if a horse had a substantial winter coat, indicators of malnourishment would be visible, such as

protruding bones. Dr. McDonald testified that after their removal, all of the horses properly regained their weight and had body condition scores of 4.5 and higher.

Defendant's proof consisted of the testimony of two witnesses. Defendant's neighbor, Bert Smith, testified that he sold hay to Defendant in January 2015. In late January, he delivered two 1600-pound bales of hay. Defendant returned for more hay about one week later, and he provided Defendant two more bales of hay. Mr. Smith continued providing hay for Defendant until the horses were removed in April 2015. Mr. Smith testified that he did not know whether Defendant fed the hay to the horses. Mr. Smith had delivered hay to Defendant in prior years, but it was not consistently, and Defendant purchased hay from other people as well.

Defendant's husband, Paul Wood, testified that Detective Binkley warned him and Defendant in June 2014 that the horses needed to be fed more. Mr. Wood testified that he and Defendant bought 20 large bales of hay in the summer of 2014, as well as several scoops of grain. Mr. Wood testified that in December, 2014, and January, 2015, he noticed that his hay supply "had more sticks in it than it had hay." Mr. Wood testified that he began purchasing hay from Mr. Smith and that Smith provided a steady supply of "decent" quality hay. Mr. Wood believed the horses were healthy and were gaining weight before the winter came. Mr. Wood agreed that the "horses were light," but he denied that it was from a lack of feeding. He testified that the horses were healthy before the winter season came.

### Sentencing hearing

At the sentencing hearing, Alisha Rupp from the VEA testified concerning the expenses involved in removing the horses from the defendant's property and the maintenance in getting the horses back on a healthy track. The removal involved multiple vehicles from VEA, and the horses had to be picked up and transported to the VEA facilities. The horses were also given medical care including a veterinarian examination and vaccinations. VEA also provided boarding and additional feed to get the horses' weight back up. In total, VEA incurred $4,134 in expenses caring for Defendant's horses.

Defendant testified that she was the primary caregiver for her grandson. Defendant's daughter-in-law testified that the grandson's behavior had improved since being in Defendant's care. Defendant further testified that she was unemployed, and she paid $2,500 in attorney's fees to enforce a child support order against her son, the child's father. Defendant acknowledged prior convictions in Arkansas and Oklahoma, and that she had violated the conditions of probation in the past.

The trial court noted Defendant's history of criminal conduct, finding at least three prior felonies. The court also found that Defendant had twice failed to comply with the conditions of alternative sentencing. The trial court considered one mitigating factor, that Defendant's conduct did not cause or threaten serious bodily injury. However, the court declined to give any weight to this factor since the horses were nearly starved to death, and there were eight horses, but only one count of animal cruelty in Defendant's case.

*Analysis*

*Sufficiency of the Evidence*

On appeal, Defendant contends that the evidence is insufficient to support her conviction. When the sufficiency of the evidence is challenged, the relevant question for the appellate court is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Harvell*, 415 S.W.3d 853, 857 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence presented. *Harvell*, 415 S.W.3d at 857; *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Furthermore, "a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *Harvell*, 415 S.W.3d at 858 (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially covered and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379-81 (Tenn. 2011); *see also State v. Sutton,* 166 S.W.3d 686, 691 (Tenn. 2005). The standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of cruelty to animals under Tennessee Code Annotated section 39-14-202(a)(2), which provides that "[a] person commits an offense who

intentionally or knowingly . . . [f]ails unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody." A person acts knowingly when he or she is aware of the nature of the conduct or aware that the relevant circumstances exist. T.C.A. § 39-11-106(a)(20). Defendant argues that the proof is insufficient to establish that she engaged in conduct that would lead a rational trier of fact to believe that she intentionally or knowingly failed unreasonably to provide food to the horses.

At trial, several witnesses testified as to the condition of the horses and the lack of grass or hay available to the horses. In June 2014 Detective Binkley warned Defendant that her horses were being underfed and that she needed to provide more hay to the horses. Several months later, Defendant had failed to remedy the situation. When Detective Binkley returned to Defendant's farm in April 2015 he observed a lack of food available to the horses. Detective Nichols and Agent Skillington also found no evidence of adequate food.

Mary, a pregnant mare and the horse elected as the victim of a single count of animal cruelty, had a body condition score of 1, the lowest possible on the scale. A healthy horse's body condition score is between 4 and 6, and anything below 4 indicates that a horse is "being underfed and not receiving the nutrients that it needs." Properly-fed horses have "moderate fat cover everywhere" and "no bony prominences that are visible." Mary's spine, ribs, and hip bones were all visible, and her foal was undersized due to mare malnutrition.

Dr. McDonald testified that horses with a body condition score of 2 begin burning muscle mass for energy due to underfeeding. At a score of 1.5, horses start burning the fat that protects their vital organs. When a horse declines to this point, its life is in danger. Dr. McDonald examined Mary and determined that the mare did not have a medical condition that would prevent her from eating properly. She also opined that the change in the horse's condition could not have been sudden.

The condition of Defendant's other horses further supports the explanation that Mary's condition was due to underfeeding. Several other horses fell short of the healthy range. Agent Skillington assessed the horses at body condition scores of between 1.5 and 3, and Dr. McDonald gave the horses scores of between 1 and 2. All of the horses had visible ribs, spines, hips, and shoulder and tail bones. Dr. McDonald testified, "[y]ou don't see an entire group of thin animals that are being fed appropriately."

Our cruelty to animals statute imposes an affirmative duty of care for animals within one's custody whether or not they are owned by the actor, and whether or not the custodian is actually physically present. *State v. Roy Edward Tolliver, Jr.*, No. E2003-02886-CCA-R3-CD, 2005 WL 737090, at *2 (Tenn. Crim. App. Apr. 1. 2005), *no perm.*

*app. filed.* Viewed in the light most favorable to the State, a rational trier of fact could find that Defendant knowingly and unreasonably failed to provide necessary food for the horses. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant asserts that her sentence is excessive, that the trial court abused its discretion in weighing the applicable enhancement and mitigating factors, that the trial court erred by imposing a sentence which includes confinement, and that the trial court erred by failing to make a finding regarding Defendant's ability to pay restitution.

Defendant was convicted of one Class A misdemeanor offense. The trial court imposed a sentence of 11 months and 29 days to be suspended on probation after 45 days' incarceration, and the trial court ordered Defendant to pay $4,134 in restitution.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences in felony cases that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).

This standard applies to misdemeanor sentences as well, and trial courts are entitled to considerable latitude in misdemeanor sentencing. *State v. Kavonda Renee Waters*, No. M2015-00324-CCA-R3-CD, 2016 WL 3094313, at *3 (Tenn. Crim. App. May 25, 2016), *no perm. app. filed*; *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998). The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see* T.C.A. § 40-35-401(d), Sentencing Comm'n Cmts.

Decisions to deny probation are also reviewed for an abuse of discretion. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A defendant bears the burden of proving suitability for full probation, including showing that full probation will serve the ends of justice and the best interest of the public and the defendant. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). In determining whether to grant probation, a trial court should consider whether: 1) "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" 2) "confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence;" and 3) "measures less restrictive than confinement have

frequently or recently been applied unsuccessfully to the defendant." T.C.A. § 40-35-103(1)(A)-(C).

Here, the trial court found two applicable enhancement factors: 1) Defendant had a previous history of criminal conduct; and 2) Defendant had previously struggled to comply with the conditions of alternative sentencing. See T.C.A. § 40-35-114. The trial court gave little, "if any, weight" to the mitigating factor that Defendant's conduct neither caused nor threatened serious bodily injury, finding that animals are "living, breathing being[s] that obviously ha[ve] senses and feel[ ] pain."

We must disagree with the trial court's implicit conclusion that the statutory mitigating factor in T.C.A. §40-35-113(1), "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury," did not apply in this case because of the bodily injury to the horses. A plain language reading of the applicable statutes concerning mitigating and enhancement factors leads to the conclusion that references to serious bodily injury or bodily injury refer only to humans. Other panels of this court have previously determined that this mitigating factor is inapplicable to reduce a sentence in cases involving animal cruelty where the animal(s) suffered bodily injury, thus implicitly concluding that the statutory definition of bodily injury and serious bodily injury does not include such injuries to animals. *See Tolliver, Jr.*, No. E2003-02886-CCA-R3-CD, 2005 WL 737090 (Tenn. Crim. App. Apr. 1, 2005); *see also State v. Judy Johnson and Stanley Johnson*, No. W2001-01272-CCA-R3-CD, 2002 WL 1426547, at *17 (Tenn. Crim. App. June 26, 2002). The majority opinion in *State v. Noah Keith Tipton*, No. E2014-02531-CCA-R3-CD, 2015 WL 9015989 (Tenn. Crim. App. Dec. 15, 2015), stated, "[t]he definition of serious bodily injury in section 39-11-106 applies to all of title 39, including, if relevant, to the aggravated cruelty to animal statute." We respectfully disagree. We conclude it is up to the legislature to expand the references to "bodily injury" or "serious bodily injury" in sentencing statutes to mammals, fish, fowl, reptiles, and other forms of life.

By reaching this conclusion, we do not minimize at all what the evidence showed of the horrific treatment of these horses. It is puzzling why Defendant was charged in only one count. Nevertheless, we totally agree with the trial court's ultimate conclusion that the mitigating factor is entitled to no weight. Since "serious bodily injury" would not apply to horses, and the crime of conviction solely pertained to horses and not to persons, the mitigating factor is not applicable.

The court noted that there were eight horses, but Defendant was charged with only one count, and that "these horses were near starved to death when they were received by the rescue facility." The court further noted that Defendant was given an opportunity to

correct the situation and failed to do so. Considering those factors, the trial court denied full probation and ordered Defendant to serve 45 days of her sentence in confinement.

We conclude that the trial court acted within its discretion in sentencing Defendant. Defendant argues that the trial court "applied the wrong weight to the factors it considered in setting her sentence." However, the weighing of enhancement and mitigating factors is left to the trial court's discretion. *Bise*, 380 S.W.3d at 706.

Defendant also contends that the trial court erred by ordering her to pay $4,134 in restitution to the VEA for their removal and care for the horses. We review a trial court's order of restitution under an abuse of discretion standard, with a presumption that the trial court's ruling was reasonable. *See State v. John N. Moffit*, No. W2014-02388-CCA-R3-CD, 2016 WL 369379, at *4 (Tenn. Crim. App. Jan. 29, 2016), *perm. app. denied* (Tenn. June 24, 2016) (citing *Bise*, 380 S.W.3d at 708). There is generally no formula for awarding restitution, and the sentencing court need not determine restitution in accordance with the strict rules of damages applied in civil cases. *State v. Johnson*, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997).

In setting restitution, the trial court "must ascertain both the amount of the victim's loss and the amount which the defendant can reasonably be expected to pay." *State v. Bottoms*, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). Considering the defendant's resources and ability to pay in setting restitution "'is a judicial duty that the trial judge cannot delegate to another.'" *State v. Darren Eugene Fleshman*, No. E2013-00557-CCA-R3-CD, 2014 WL 2804183, at *9 (Tenn. Crim. App. June 18, 2014), *perm. app. denied* (Tenn. Nov. 21, 2014) (quoting *State v. Donna Harvey*, No. E2009-01945-CCA-R3-CD, 2010 WL 4527013, at *5 (Tenn. Crim. App. Nov. 9, 2010)).

Here, the trial court ordered restitution in the exact amount testified to by an employee of the VEA. Alisha Rupp testified that the VEA's expenses in removing the horses and providing care for the horses totaled $4,134. The testimony provided a sufficient basis for the particular amount of restitution. Defendant asserts that the trial court did not consider her ability to pay restitution. Defendant testified at the sentencing hearing as to her household income and living expenses. The trial court considered Defendant's testimony and determined "I think, based upon what I'm hearing here, I think there should be some money to start some restitution in this case." The trial court declined to impose any fine and offered to extend Defendant's probation period or reevaluate her monthly payment amount with her probation officer. We conclude that the trial court considered Defendant's financial resources and ability to pay restitution. Defendant is not entitled to relief on this issue.

*Rules 403 and 404(b) Evidence*

Defendant argues that the trial court should have excluded Detective Binkley's testimony about his June 2014 visit to Defendant's farm as improper character evidence under Rule 404(b) and as unfairly prejudicial under Rule 403. The State responds that the testimony was not character evidence, that it was relevant to show Defendant's knowledge, and that any risk of unfair prejudice was outweighed by its probative value.

Evidence of a defendant's other wrongs, crimes, or acts may not be offered to show that the defendant acted in conformity with a character trait. Tenn. R. Evid. 404(b). To be admissible, the evidence must be relevant to an issue the jury must decide. *State v. Clark*, 452 S.W.3d 268, 288 (Tenn. 2014). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

"[E]vidence of prior bad acts cannot be used to prove that a person has a propensity to commit a crime." *State v. Adams*, 405 S.W.3d 641, 659 (Tenn. 2013). Such evidence is admissible for "other purposes," however, such as identity, motive, intent, or guilty knowledge. Tenn. R. Evid. 404(b); *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). In order for evidence of other crimes, wrongs, or acts to be admissible under Rule 404(b) for "other purposes," the following must be satisfied:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). As long as the trial court substantially complies with these conditions, the determinations made are entitled to deference. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005). We review a trial court's decision to admit Rule 404(b) evidence under an abuse of discretion standard. *Id.*; *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).

In this case, the trial court substantially complied with the procedural requirements of Rule 404(b). The court conducted a hearing prior to trial, at which Detective Binkley testified about his June 2014 visit. The trial court concluded that the testimony was relevant to show "Defendant's knowledge of the alleged malnourished condition of the horses," and that the testimony was relevant to "tell[ ] the entire story." The trial court further concluded that the prejudicial effect of the evidence did not substantially outweigh the probative value.

Defendant argues that "the testimony by Binkley that [Defendant] reported being out of town for the previous month prevents the proof from rising to meet the level of 'clear and convincing.'" The clear and convincing evidence standard applies to proof that Detective Binkley visited Defendant in June, 2014, found the horses in poor condition, and warned Defendant to provide better care for the horses, not whether Defendant committed cruelty to animals in June, 2014. Defense counsel acknowledged at the hearing, "[w]e know that Detective Binkley went out there because he'd had a report. He spoke with [Defendant]." We conclude that the evidence was sufficient to find that the prior act occurred.

The testimony of Detective Binkley, concerning his June 2014 visit to Defendant's farm, is not character evidence and it completes the narrative for the jury and proves that Defendant was put on notice. *See State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000). The testimony shows that Defendant was aware that the horses were being underfed in June 2014. The testimony also provides context for the return visit in April 2015. Knowledge is a necessary element of a cruelty to animals charge. T.C.A. § 39-14-202(a)(2). Detective Binkley's testimony is highly probative since it establishes a necessary element of the offense.

Defendant argues that the gap in time between the first visit in June 2014 and the charged offense is unfairly prejudicial. However, an "objection based on remoteness affects only the weight, not the admissibility of the evidence." *State v. Smith*, 868 S.W.2d 561, 575 (Tenn. 1993). The trial court actually mitigated any risk of unfair prejudice by giving the jury a limited instruction regarding the prior visit. The instruction told the jury that such evidence "may only be considered . . . for the limited purpose of determining whether it provides" the complete story of the crime, Defendant's intent, or guilty knowledge. Absent contrary evidence, jurors are presumed to follow the judge's

instructions. *State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003). Furthermore, such instructions minimize any risk of unfair prejudice from Rule 404(b) evidence. *Gilley*, 297 S.W.3d at 758-59.

The trial court did not abuse its discretion by allowing Detective Binkley's testimony about the prior visit to Defendant's farm. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE